UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 09-119-P-H
)
BRETT PEARCE, )
)
     *Defendant* )

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Brett Pearce, charged with conspiracy to distribute and possess with intent to distribute heroin, and aiding and abetting that conspiracy, in violation of 21 U.S.C. §§ 841(a)(1) and 846, Indictment (Docket No. 3), moves to suppress all evidence seized and all statements made by him to law enforcement officers with respect to this charge. Motion to Suppress ("Motion") (Docket No. 40) at 1. A hearing was held before me on June 9, 2010, at which the defendant was present. Two witnesses testified for the government and seven government exhibits were admitted without objection. The defendant did not present any evidence. I now recommend that the court make the following findings of fact and deny the motion.

### I. Proposed Findings of Fact

At approximately 1:30 p.m. on March 28, 2009, Trooper Philip Alexander of the Maine State Police was in his cruiser at the York Toll Plaza on the Maine Turnpike when he observed a black Ford Expedition travelling north with a Maine registration but without a front registration plate. He activated the blue emergency lights on his cruiser and initiated a traffic stop of the Expedition at approximately mile 10 northbound.

1

The driver produced a Maine driver's license identifying him as Craig Allard. The sole passenger stated that he owned the Expedition and produced a vehicle registration identifying him as Brett Pearce, the defendant. He also produced a Maine driver's license and a photographic Cumberland County jail ID card. The defendant told Alexander that they were returning from a trip to Foxwoods in Connecticut.

Alexander ran background checks on the two and learned that both had extensive criminal histories including drug convictions and that Allard was subject to current bail conditions. Alexander made further inquiry about Allard's bail conditions and learned that the conditions included random search of Allard's person and vehicle. He also spoke with State Police Detective Roger Teachout, who called him when he heard radio traffic to the effect that Alexander was engaged in a traffic stop and seeking information on the occupants. Teachout told Alexander that he had recent information that the defendant was trafficking heroin and that he was en route to talk with the defendant and to assist Alexander.

Two to three weeks before the stop, a confidential informant told Teachout that the defendant was one of the biggest heroin dealers in the Biddeford/Saco area, that he went to Massachusetts to purchase heroin about three times per week, and that each purchase was at least "three fingers" of heroin. The informant also provided a nickname, a physical description, a home address, and a telephone number for the defendant, and stated that he or she had seen the defendant with as much as six to eight "fingers" of heroin, that the defendant had previously been arrested for trafficking in drugs, and that the defendant drove a black Ford Expedition. The day before the stop, Teachout drove past the home address and saw the black Expedition registered to the defendant parked there.

After speaking with Teachout, Alexander also requested the assistance of a drug canine unit.

Alexander returned to the Expedition and asked Allard to get out, which Allard did. Once outside the vehicle, Allard admitted that he was on bail for drug possession and that he had previously been on probation for drug violations. He appeared nervous, taking deep breaths and visibly shaking. He acknowledged that he was subject to bail conditions and consented to Alexander's request to search him and the vehicle.

Alexander then instructed the defendant to get out of the Expedition, which he did. The defendant said that he knew that Allard was on bail, that both of them were "clean," and that they had known each other for some time after meeting in a drug rehabilitation program. He said that he had a previous heroin trafficking conviction.[1] He told Alexander that there was no contraband in the Expedition. Alexander told the defendant that he was going to search the Expedition and the defendant responded that he knew that Alexander had a job to do. The defendant did not protest or question Alexander's intention to search the vehicle.

Alexander searched the Expedition for weapons and contraband. He found an expandable metal baton in the map compartment behind the passenger's seat, but "nothing of import to a drug investigation." He then allowed the men to get back into the Expedition. Alexander next spoke again with Teachout, who indicated that the drug canine was en route and that Teachout would arrive momentarily. Approximately 3 minutes later, Teachout arrived. Alexander asked Allard to step out of the Expedition. Allard said that he was shivering because he was cold, so Alexander told Allard that he could sit in Alexander's cruiser, which Allard did.

---

[1] At the hearing, defense counsel made much of the fact that the defendant did not in fact have any conviction for trafficking in heroin at the time, but only an arrest for trafficking resulting in a conviction for possession of a scheduled drug that could have been heroin. I do not see this inconsistency as impugning either Alexander's memory or his credibility.

3

Teachout, a 20-year veteran of the State Police, spoke first with the defendant, who said that he did not have any drugs on him and that there were no drugs in the vehicle. He then spoke with Allard, who could not produce any receipts showing that the men had been to Foxwoods and said that there were no drugs in the vehicle. Trooper Forbes had arrived by this time with his drug canine, which conducted a sniff search of the vehicle. Shortly thereafter, Teachout was informed that a passing motorist had contacted the York police and reported observing the individual closest to the wood line at the traffic stop throwing something over his shoulder. Teachout asked Forbes to search the area near where the defendant had been standing. Forbes and his dog searched the area and retrieved a cigarette pack.

Teachout looked into the cigarette pack and saw what appeared to be three "fingers" of heroin. He knew that a "finger" of heroin is approximately 10 grams. Teachout then arrested the defendant and put him into Teachout's cruiser. At this time, approximately 2:15 p.m., Alexander arrested Allard, who remained in Alexander's cruiser.

Teachout administered the *Miranda* warning[2] to the defendant, who immediately waived his rights to counsel and to remain silent. He stated that he had paid $3,000 for the heroin from a supplier in Massachusetts, whom he named. He stated that he could easily get another three "fingers" of heroin and spoke of other drug trafficking activity that he knew about.

At no time during his conversations with the defendant did Alexander observe any sign of intoxication or impairment. The defendant answered all of his questions in a clear, coherent manner. Alexander did not observe any slurring or any delay in the defendant's responses. At no time during his interaction with Teachout did the defendant say that he had recently used heroin, nor did he exhibit any signs of intoxication. He was coherent, and his speech and tone were normal.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

On March 28, 2009, the day in question, Teachout's cruiser was equipped with video and audio equipment, and the record of this stop is presented on Government Exhibit 5, a DVD that is also Exhibit A to Teachout's affidavit, which is Government Exhibit 2. Alexander's cruiser did not have the capacity to videotape or record.

The log of the state police dispatch center's communications with respect to this incident shows that the Expedition was stopped at 1:34 p.m. and that the call from the York police conveying the information from the anonymous passing motorist came in at 2:09 p.m. Government Exhibit 6 at 1.

While the troopers were making arrangements to transport the two men to a police station in order to facilitate their cooperation, Allard committed suicide by running in front of a truck.

## II. Discussion

### A. Standing

The government contends, as a threshold matter, that the defendant lacks standing to challenge the use of the heroin retrieved at the scene of the stop as evidence against him because he had no expectation of privacy in the area where the heroin was found. Government's Objection to Defendant's Motion to Suppress ("Opposition") (Docket No. 48) at 4-7. If a defendant has no reasonable expectation of privacy in an item of evidence, or in the area that was searched, there is no "search" that could violate that defendant's constitutional rights. *See, e.g., Illinois v. Andreas*, 463 U.S. 765, 771 (1983); *United States v. Lipscomb*, 539 F.3d 32, 35-36 (1st Cir. 2008).

The government is correct. "It is well settled that if a defendant abandons property while he is being pursued by police officers, he forfeits any reasonable expectation of privacy he may have had in that property." *United States v. Figueroa*, 187 F.3d 623 (table), 1998 WL 1085825

(1st Cir. Sept. 22, 1998), at *4. *See also United States v. Lewis*, 40 F.3d 1325, 1334 (1st Cir. 1994) (defendant abandoned rock of cocaine tossed from his person during pursuit); *United States v. Wilson*, 36 F.3d 205, 209 (1st Cir. 1994) (defendant had no reasonable expectation of privacy in packet dropped on public street). There can be no reasonable question that the heroin involved in this case was abandoned. The defendant accordingly lacks standing to seek its suppression.

The defendant does not respond directly to the government's argument on this issue. He apparently takes the position that his general contention that the heroin would not have been found and any statements would not have been made by him "if [he had] not been subject to an illegal seizure," Defendant's Reply Memorandum ("Reply") (Docket No. 51) at [5], trumps his lack of legal standing. I need not consider this argument, however, because I conclude that there was no illegal seizure, or arrest. *See* Part II.C, *infra*.

### B. *Miranda* Violation

With respect to the defendant's contention that his statements were obtained in violation of the strictures of *Miranda*, Motion at 9-15, there is no evidence whatsoever in the record to support that defendant's assertions that Trooper Alexander and Detective Teachout "knew the defendant, at the time, was under the influence of extremely strong intoxicating drugs which have severe mind altering, psychological and physiological effects[,]" that they knew that the defendant "was a heroin addict prior to their questioning of the defendant," and that "the clearly obvious signs of the defendant (being under the influence of drugs) were outwardly apparent" when he was questioned, Motion at 11. There is no evidence that he "had recently ingested heroin and was <u>presently under the influence</u> (the high) at the time of questioning" and was "not suffering from the effects of withdrawal[.]" *Id.* Contrary to the defendant's presentation, *id*. at

6

13-14, this question does not "come down to a 'he said – she said' scenario[,]" because there is no evidence contrary to the testimony of the state troopers for the court to weigh.

The undisputed evidence in this proceeding is that the defendant presented no signs of intoxication of any sort to the state troopers and that his speech was clear and coherent. The defendant takes nothing by his contention that his statements were obtained in violation of *Miranda*.

### C. The Search and Alleged "de facto" Arrest

The defendant has devoted a considerable portion of his written motion and his counsel devoted a considerable portion of his oral argument to the contention that the search of the Ford Expedition by Alexander was "illegal," primarily because, he contends, Allard could not give consent to search the vehicle, the defendant never gave explicit consent to the search, and Alexander did not have sufficient warranted suspicion to allow him to search the vehicle without the defendant's permission. Motion at 4-9. However, this argument does not appear to me to be relevant to the question of whether either the heroin or the defendant's statements to the troopers must be suppressed on constitutional grounds, because neither was a result of the search. No evidence was found in the vehicle, and none of the questions posed to the defendant has been shown to have resulted from the fruitless search.

The defendant does not challenge the validity of Alexander's initial stop of the Expedition. Motion at 4. The appropriate argument, therefore, it seems to me, is another raised by the defendant, albeit perhaps not in a timely manner:[3] whether the "prolonged detention" of the defendant, during which the search occurred, Teachout arrived, and the drug canine arrived,

---

[3] This issue was first raised in the defendant's reply memorandum, and, ordinarily, issues belatedly raised in this fashion will not be considered by the court. *E.g., United States v. Petraia Maritime, Ltd.*, 483 F.Supp.2d 34, 40 (D. Me. 2007); *United States v. Smith*, Nos. CRIM. 94-34-P-C, Civ. 99-317-P-C, 2000 WL 760973 (D. Me. Apr. 18, 2000), at *2 n.2. The government did not object to the court's consideration of this issue, and, in the exercise of caution, I will address it on the merits.

was illegal, thereby invalidating the use against him of both the heroin and any of the defendant's statements. Reply at [1]-[5]. The defendant cites *United States v. Starks*, 301 F.Supp.2d 76 (D.Mass. 2004),[4] for the proposition that "once the reason for the stop dissipated, neither the driver (who had a pending drug trafficking charge) nor the passenger (who had recently been arrested for a firearms charge) could be subject to further detention." Reply at [3].

In that case, a Jeep was appropriately stopped by police because the rear license plate was not illuminated; police then determined that the driver's license was suspended. *Id*. at 79, 82. In the process of writing a citation for the driver's violation, an officer learned that the driver "had a pending drug trafficking case." *Id*. at 79. Given the "general reputation of the area for drug trafficking, and the early morning hour," the officer asked the driver for consent to search the Jeep, which was given. *Id*. at 79-80. The officers eventually frisked the passenger and found a loaded pistol in his waistband. *Id*. at 80.

The court held that the detention of the passenger after the citation for the driver was written was not legally justified, because "[t]he only new information that the officers gained, and which, they asserted, warranted further investigation, was [the driver's] pending drug trafficking case followed by [the driver's] consent to the search of the vehicle[,]" which did not justify further detention of the driver "let alone" the passenger. *Id*. at 83. The court went on to say that the passenger's "continued detention might have been justified if the officers had developed a reasonable suspicion that he himself was armed or carrying contraband." *Id*. That is precisely the case here.

Alexander, through Teachout, had sufficient information to develop a reasonable suspicion that the defendant was carrying illegal drugs, given the information provided by the confidential informant, some of which Teachout had verified, and the facts that the defendant

---

[4] The defendant mistakenly presents this decision as one of the First Circuit. Reply at [3].

was coming into Maine after admittedly having been in Massachusetts (albeit assertedly in transit), the source of the defendant's heroin according to the informant. *See generally United States v. Zayas-Diaz*, 95 F.3d 105, 112 (1st Cir. 1996).

The other case on which the defendant relies in this regard, also from the District of Massachusetts, is *United States v. Sugar*, 322 F.Supp.2d 85, 93 (D. Mass. 2004). Reply at [4]. The defendant contends that, in that case, the court "ruled that a refusal to allow consent to search [] a motor vehicle did not provide a basis for detaining the defendants an additional 10-15 minutes until a drug dog arrived, even though the defendants were coming from a known drug source state, heading across country to a drug pipeline state and the passenger was visibly shaking during his interaction with the investigating officer." *Id*. That summary of the case is correct, so far as it goes.

However, in the case at hand, no refusal to allow a search occurred. In addition, the troopers had evidence specifically concerning the defendant that justified his continued detention to wait for the arrival of the drug canine. The time elapsed from the initial stop to the defendant's arrest was less than 45 minutes. In this district, that is not enough to constitute a *de facto* arrest. *See, e.g., United States v. Brame*, Criminal No. 06-53-P-H, 2006 WL 2943406 (D. Me. Oct. 12, 2006), at *6-*7 ("slightly over 30 minutes); *United States v. Parsley*, Criminal No. 05-86-P-H, 2006 WL 1441855 (D. Me. May 23, 2006), at *5 (51 minutes); and *United States v. Maldonado*, No. CR. 02-85-P-H, 2002 WL 31444563 (D. Me. Nov. 1, 2002) at *6 (two hours).

The defendant is not entitled to suppression on this basis.[5]

---

[5] In this regard, I reject the argument of defense counsel to the effect that, had Alexander allowed Allard and the defendant to drive away after citing them for the missing license plate, the heroin would never have been found. It is not possible to discern from the record when the call from the passing motorist was made to the York police, and, therefore, whether the motorist saw the attempted disposal of the heroin during the defendant's first time outside the Expedition, or at some later time during the allegedly illegal detention. If the former, the call would have led to the inevitable discovery of the heroin and its linking with the defendant's properly-acquired personal identification

9

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and the motion to suppress **DENIED**.

*NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 15th day of June, 2010.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

information. It is only the latter version of the facts that would support defense counsel's scenario, but that can only be considered speculation under the circumstances.